# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 10-CR-174 (EGS)** |
| v. | : | **FILED** |
| **LIM YONG NAM (a/k/a Steven Lim)** | : | **DEC 1 5 2016** |
| **Defendant.** | : | Clerk, U.S. District & Bankruptcy Courts for the District of Columbia |

## STATEMENT OF THE OFFENSE

1. The parties in this case, the United States of America and the defendant, Lim Yong Nam (a/k/a Steven Lim), (hereinafter "the defendant"), stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

### International Emergency Economic Powers Act ("IEEPA")

2. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declared a national emergency with respect to that threat.

3. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat." 44 Fed. Reg. 65729 (Nov. 14, 1979).

4. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. 60 Fed. Reg. 24757 (May 9, 1995).

5. Executive Order No. 12959, as consolidated with other prior Executive Orders in, and supplemented by, Executive Order No. 13059 (August 19, 1997), and as extended by Presidential Notice of March 10, 2004 (69 Fed. Reg.12051 (Mar. 12, 2004)), was in effect at all times relevant to this case.

## The Relevant Conduct

6. The defendant is a 42-year-old citizen of Singapore. During the course of the module transactions set forth below, the defendant acted as a wholesaler of electronic or telecommunications equipment. The defendant did not have manufacturing capabilities, but rather acted as a "trader" who brokered the buying and selling of components without incorporating them into completed end-products or other value-added goods. The defendant profited for acting as such a broker.

7. At no point during any of the transactions described in the acts set forth below did the defendant or his co-conspirators apply for or receive a license or other authorization from the Office of Foreign Assets Control, United States Department of the Treasury, located in the District of Columbia -- as is required by U.S. law -- to export directly or indirectly U.S.-origin commodities from the United States to Iran.

8. On June 20, 2007, Wong Yuh Lan, also known as Jancy Wong (Wong), while working in Singapore as an employee of Opto Electronics, contacted Company A in the United States and asked for a price quotation on the purchase of 6,000 modules; Company A responded

with a price of 98.45 United States dollars (USD$) per module.

9. That same day, Wong, in Singapore, contacted Hossein Larijani (Larijani), in Iran, and advised Larijani that 6,000 modules could be purchased from Company A at a price of USD $98.45 per module. Wong then requested that Company A sell the 6,000 modules at a price of USD $60.00 per module. In response, Company A asked Wong to provide end-use and end-user information.

10. The following day, Wong advised Company A that the 6,000 modules were intended for a local customer in Singapore.

11. The next month, on July 4, 2007, Company A advised Wong that the best price that Company A could give to Wong was USD $93.50, unless Wong provided more details about the end-use and the end-user for the modules.

12. Wong never provided those details. Instead, approximately one week later, on July 11, 2007, Wong contacted the defendant and his company, NEL Electronics, also in Singapore, and asked NEL Electronics to take over the order to purchase 6,000 modules from Company A creating an additional layer for the transaction involving the United States origin modules to Iran.

13. Thereafter, between July 11, 2007 and July 16, 2007, NEL Electronics requested that Corezing, a Singapore based company, initiate contact with Company A to negotiate the deal adding yet another layer for the transaction.

14. As a result, Lim Kow Seng (Seng), also known as Eric Lim, while representing that he was working in Singapore for Corezing, contacted Company A on July 16, 2007, about purchasing 6,000 modules to be exported from the United States.

15. That same month, Corezing discussed with the defendant and his company NEL

Electronics the purchase of the 6,000 modules from Company A for NEL Electronics at a price to NEL Electronics of USD $77 per module.

16. On August 7, 2007, the defendant forwarded a purchase order to defendant Larijani, in Iran, noting that the 6,000 modules would be shipped in five separate orders from the United States. The purchase order stated that the total value of the order was USD $510,000, or USD $85 per module.

17. On August 16, 2007, Corezing wired approximately USD $14,000 to Company A's bank account in the United States as a deposit on the negotiated order.

18. In December 2008, two of the modules, which were a part of the transactions facilitated by the defendant and his co-conspirators, were recovered in Iraq as components of Improvised explosive devices ("IEDs"), also known as "roadside bombs." In April 2009, an additional 12 modules, which were a part of the transactions facilitated by the defendant and his co-conspirators, were recovered in Iraq as components of IEDs. IEDs caused a majority of American combat casualties in Iraq between the years 2001 and 2007. However, the government does not allege that defendant knew the modules were to be used in IEDs or any other type of weapon.

### Commonalities Surrounding All Exports of Modules to Singapore

19. From August 2007 through February 2008, Company A exported 6,000 modules to Corezing via five separate shipments. For every shipment, Corezing wire transferred money to Company A's bank account in the United States as pre-payment for the upcoming shipment. After these funds cleared Company A's bank, Company A would prepare the requested number of modules for shipment to Singapore. Through previous correspondence with Company A's representatives, Corezing provided Company A with various shipment

information, such as the "Bill To" and "Ship To" addresses. In each instance, Corezing instructed Company A to ship the modules to Corezing, but also listed a freight forwarder located at Singapore's Changi Airport as the "Care of" (C/O) destination.

20. For each of the five separate shipments, Company A used information provided by Corezing to prepare a Shipper's Export Declaration (SED). The SED is a form required by the United States, filed specifically with the United States Department of Commerce. For each of the SEDs that Company A filed for each shipment, it listed Singapore as the country of ultimate destination. As explained below, this was not true. But this false information had been provided to Company A by Corezing. In so doing, Corezing and the others involved in the conspiracy caused Company A to make false representations of material facts to the United States government.

21. For the final three shipments made between October 2007 and February 2008, Company A required that Corezing fill out a BIS Form 711, commonly known as an end-user statement, before fulfilling the order. The form requested, under penalty of perjury, information concerning the end-use and end-user for these modules. Corezing submitted three BIS-711 forms to Company A with the knowledge that these forms were to be provided to a United States government agency. On each of these BIS Form 711s, Corezing, through the actions of Seng, Benson Hia (Hia), and defendant, falsely indicated that the ultimate consignee for these shipments were defendant and his company NEL Electronics, who would incorporate these modules into a wireless module for a "telecom project" in Singapore, and that defendant and NEL Electronics would not resell or re-export the product without authorization from the United States government.

22. Company A used Federal Express to ship each order from the United States to Singapore. Once the modules arrived in Singapore, they were consolidated with other cartons of electronic components and re-exported to Iran. The re-export of these modules usually occurred within a few days of the shipment arriving in Singapore.

### The Defendant's Knowledge that the Modules Had Been Obtained by Fraud

23. During the time period covering the shipments of the modules in question, the defendant and his co-conspirators knowingly made, or caused others to make, materially false representations and statements concerning the purchase of modules from Company A. Prior to any of the modules being shipped to Singapore by Company A, the defendant and his co-conspirators and their companies had entered into business agreements to purchase and sell these components to each other, with the intended final destination of Iran. For example, Corezing, through its agent Seng, had entered into a non-cancellable, non-returnable contract with NEL Electronics and its agent, the defendant, in which NEL Electronics would purchase 6,000 of Company A's modules from Corezing. Opto Electronics, acting through its agent Wong, entered into a purchase order agreement with NEL Electronics for the purchase of these same modules. The fact that Larijani owns Opto Electronics and employs Wong as his purchasing agent in Singapore combined with the fact that Larijani had previously instructed Wong to procure 6,000 of Company A's modules to be sent to him in Iran makes it clear that the purchase of these modules by Corezing was a carefully crafted structured transaction meant to shelter the true end-user from the knowledge of Company A.

24. At no point in this series of transactions did the defendant or his any of his co-conspirators inform Company A that these modules were destined for Iran. To the contrary,

when Company A requested end-use and end-user information regarding the sale of its modules (via e-mail correspondence and also through the use of BIS Form 711), the defendant and his co-conspirators caused false indications that the modules would be used for a customer in Singapore.

the defendant and his co-conspirators consistently falsely indicated that the modules would be used for a customer in Singapore. The defendant and his co-conspirators were aware that the modules were U.S.-origin goods, either through direct contact with Company A's representatives or through a review of their e-mail correspondence and their sales agreements which note this fact. The defendant and his co-conspirators were directly aware of the restrictions on sending U.S.-origin goods to Iran.

25. In fact, shortly after the modules arrived in Singapore, they were kept in storage at a freight forwarding company until being aggregated with other electronic components and shipped to Iran. There is no indication that the defendant or any of his co-conspirators ever took physical possession of these modules before they reached Iran or that they were incorporated into another product before being re-exported via commercial airfreight to Iran.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar Number 415 793

By: _____
ARI REDBORD
(DC BAR #: 476 998)
Assistant United States Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7018
Ari.Redbord@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney, Shalon Wu, Esquire. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 12/15/16

_____
Lim Yong Nam (a/k/a Steven Lim)
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 12/15/16

_____
Shalon Wu, Esq.
Attorney for Lim Yong Nam (a/k/a Steven Lim)

9